IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

JOHN C. DePAOLI,

    Plaintiff,

vs.                                                        Civ. No. 04-1046 RLP

JOANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

    Defendant.

## MEMORANDUM OPINION AND ORDER

Plaintiff, John C. DePaoli, brings this action pursuant to §§42 U.S.C. 405(g) seeking judicial review of the decision of the Commissioner of Social Security to terminate benefits previously awarded under Title II of the Social Security Act.

**I.    Standard of Review**

Review of the Commissioner's decision is limited to determining whether her decision is supported by substantial evidence and whether correct legal standards were applied. Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994), citing Pacheco v. Sullivan, 931 F.2d 695, 696 (10th Cir. 1991). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Glass v. Shalala, 43 F.3d 1392, 1395 (10th Cir.1994). "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." Musgrave v. Sullivan, 966 F.2d 1371, 1374 (10th Cir.1992). In conducting this review, I may not reweigh the evidence or try the issues de novo, Sisco v. United States Dep't of Health and Human Servs., 10 F.3d 739, 741 (10th Cir.1993). I will, however, meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met. Washington v. Shalala,

37 F.3d 1437, 1439 (10th Cir.1994).

## II.     Procedural Background

Plaintiff was awarded child's insurance benefits under Title II of the Social Security Act in May1980, based on disability caused by a 1979 automobile accident.  (Tr. 27).  His case was reviewed in 1985-1986 and benefits were continued.  (Tr. 28).  On June 29, 2000, the Commissioner notified Plaintiff that his benefits would be terminated because medical improvement in his condition enabled him to work.  (Tr. 36-43).  Plaintiff requested reconsideration of the decision to terminate. (Tr. 44).  On June 13, 2001, the Commissioner again informed Plaintiff that his benefits would cease. (Tr. 54-56).  Plaintiff requested a hearing before an ALJ  which was held on January 29, 2002.  (Tr. 267).  In a decision dated April 26, 2002, the ALJ concluded that Plaintiff's disability had ended as of June 2000.  (Tr. 10-16).  The Appeals Council declined to review Plaintiff's claim on  July 20, 2004 (Tr. 6-8), making the ALJ's decision the final decision of the Commissioner of Social Security. *See* 42 U.S.C.  §405(g), § 1383(c)(3).

## III.    Factual Background

Plaintiff was born on May 10, 1962.  In 1979 he was injured in an automobile accident. His injuries included a closed head injury, partial paralysis of the right arm and shoulder, separation of the right and left acromioclavicular joints with severely limited range of motion of the right arm, muscle wasting of the right shoulder, biceps, forearm and hand muscles, and  ataxia of the right and left sides of his body.  He walked with a pronounced limp and unsteady gait, and his right hand and arm were described as essentially useless.  (Tr. 158-160).

Plaintiff's case was administratively reviewed in 1985-1986, and his disability benefits were

continued. (Tr. 28).[1]

Plaintiff attended a community college and obtained an associate's degree in gunsmithing in 1993. (Tr. 98).

Plaintiff was sent for physical and psychological examinations in 2000 to determine if his condition had improved.

    A.    Physical evaluations:

Anthony Reeve, M.D., in internist with board certification in physical medicine and rehabilitation, evaluated Plaintiff on May 23, 2000. (Tr. 166-169, 236). He noted Plaintiff's complaints of poor memory, weakness of the right upper extremity and disequilibrium. Dr. Reeve recorded few physical abnormalities. He stated that Plaintiff walked normally, had minor focal weakness in his right arm with 5/5 strength in all the muscle groups of the right hand and arm, that he could manipulate fine objects, had no muscle atrophy in his upper or lower extremities, and had

---

[1] Examination by Dr. Alan Styskel on July 9, 1986 (Tr. 163-164), documented the following:
– Slow, deliberate gait (lifting feet purposefully to maintain a straight line).
– Right arm clasped to his right side, without arm swing.
– Definite separation of the acromioclavicular joints.
– Full passive range of motion of the right and left upper extremities, except for the right elbow, which lacked 15 degrees of extension.
– Ability to write jerkily with right hand, which had been absent at prior exam.
– Good muscle strength of both hands, and of the forearm and upper arm muscles.
– Wasting of the left calf.
– Mild weakness of the foot musculature in external rotation, internal rotation, plantar flexion and extension.
– Positive Romberg (unable to stand with eyes closed and tended to fall to the right).
– Inability to walk on heels, toes or heel toe walk without falling.
– Definite disdiadochokinesia involving right hand to rapid hand motion.
Dr. Styskel concluded:
"The patient is ambulatory, can dress himself, feed himself, takes care of all his activities of daily living and drives a car. He exercises some, but his endurance, he says, is not good. His balance is definitely poor and his strength of the right hand and of the feet is definitely poor. . . . At this time he appears to have stabilized. It is doubtful that he will receive much improvement now after nearly 7 years." (Tr. 165).

full range of motion in his shoulders, elbows and wrists. He concluded that Plaintiff could perform the job of gunsmithing at least eight hours a day, utilizing unspecified minor modifications and tool adjustments.

Plaintiff was evaluated by Michael Baten, M.D., a board certified neurologist, on February 16 and April 10, 2001. (Tr. 237, 192-198). These examinations were obtained at least in part because Dr. Reeve's findings were at odds with other evidence.[2] Following his initial examination Dr. Baten stated that Plaintiff continued to suffer right sided problems involving his arm and to a lesser extent his leg. Reevaluation by Dr. Baten was requested to address Plaintiff's gait, and to comment on the findings of Dr. Reeve. The following is a comparison of Dr. Baten's February and April physical examination findings:

|       | Motor | Reflexes | Gait | Fine manipulation |
|-------|-------|----------|------|-------------------|
| Feb.  | Diffuse weakness & clumsiness of the Rt arm | Somewhat increased on Rt, as compared to Lt., increased tone on the Rt. | Slight favoring of Rt. leg, but not hemiplegic | limited due to Rt. sided problems |
| April | Clumsiness of the Rt arm due to increased tone and hemiplegia | Rt. held in semi-flexed tight position with increased resistance & increased tone | Hemiplegic on Rt. w/ circumduction. Gait relatively stable, of reasonable speed and stamina. | no comment |

---

[2]An agency case development sheet indicates, "We are ordering the addl neurological evaluation due to the descrepancy (sic) in the statement of CR (claims representative) who took the reconsideration reports and the findings reported on Dr. Reeve's exam which seemed inconsistent." (Tr. 225). The claims representative noted that Plaintiff had difficulty walking, standing, using his arms, writing and comprehending. (Tr. 114). She also stated:

> "Claimant walked with a mild hemiparetic gait. As he left the office several employees remarked to me about his difficult gait. He had trouble using his right arm to write. He swung his right arm out because he couldn't write in a normal fashion. He seems to have trouble comprehending what was needed on the forms He thought the process was quite complicated." Id.

Dr. Baten stated that his evaluations indicated greater neurologic compromise than indicated by Dr. Reeve. Commenting on differences between the February and April examination findings, Dr. Baten stated: "There may be some change in the patient's condition. However, given the fact that the injury occurred a considerable time ago, the possibility that there may be symptom exaggeration has to be entertained." (Tr. 198). Dr Baten also stated that he doubted Plaintiff would be able to work a full day, but would be able to work several hours.

Plaintiff was seen by Bélyn Schwartz, M.D., on September 24, 2001, for a self-referred disability evaluation. (Tr. 238-240). Dr. Schwartz is board certified in physical medicine and rehabilitation. (Tr. 241). Dr. Schwartz recorded Plaintiff's history, including complaints of shoulder, back and neck pain, elbow dysfunction, headaches, morning numbness of his right hand, problems with coordination causing falls, anxiety, and short term memory loss. Physical examination was notable for the following:

– able to go from sit to stand independently

– spastic hemiplegic gait with circumduction

– significant winging of the right scapula with forward flexion (but not abduction) of the arm

– holding the right arm flexed at the elbow and across his chest when walking

– increased tone in the right hand

– decreased rapid alternating movements the upper extremities[3], right worse than left

– decreased ability to flex arm forward due to winging of the scapula

– good strength within range of motion

---

[3]This finding, although absent in the evaluations of Drs. Reeve and Baten, is consistent with the finding of dysdiadochokinesia by Dr. Styskel in 1986. (see fn. 1, supra., and Dorland's Medical Dictionary,

5

– difficulty bending forward to touch toes due to loss of balance

Dr. Schwartz took x-rays of the right shoulder, which showed "osseous fragments near the scapular spine corticoid process, chronic; subacromial spur; fracture or osteotomy defect of the distal clavical; and continued separation of the AC joint. An x-ray of the right elbow showed spurring from the olecranon. Dr. Schwartz concluded that dysfunction about the right shoulder girdle would prevent Plaintiff from performing any prolonged activity using his right dominant hand, and that his physical condition was further compromised by his unsteady gait and frequent loss of balance.

Dr. Schwartz examined Plaintiff for a second time on January 7, 2002, when he returned to her office with a questionnaire pertaining to his condition. She indicated at that time that his condition was generally unchanged, and that an injection into this right shoulder at the time of the September 2001 visit had not helped significantly. (Tr. 246-248).

B.    Psychological evaluation.

Richard Fink, Ph.D., evaluated Plaintiff in January 2001. He conducted a mental status examination and administered the Category test and the Wechsler Memory Scale III. (Tr. 189-191). Mental status exam indicated that Plaintiff was emotionally immature, with unrealistic expectations and ideas. His ability to concentrate and attend was somewhat slow but in keeping with his over all functioning. Plaintiff's performance on the Category scale was impaired.[4] The Wechsler Memory Scale showed subtest scatter, indicating that he did better with verbal as opposed to visual memory which "may explain why it took him 3yrs to complete the 2 yr Gunsmithing class." (Tr. 191). Dr.

---

[4]The typed portion of the report states that Plaintiff had difficulty with flexibility, trouble trying a new idea if something wasn't working, and trouble if there was a sudden change in the pattern. Hand written notations state that his score fell within the mildly impaired range, indicating cognitive rigidity and problems solving non-verbal tasks. (Tr. 190).

Fink diagnosed cognitive disorder NOS and personality changes due to head injury, unspecified. He concluded:

> . . . He does appear to have a number of physical problems that may interfere with his ability to work and his immaturity might interfere with his ability to take orders and direction. His immaturity is likely due, in part, to his closed head injury. It is likely that (he) could do some work in the gun smith field but could not do highly technical tasks. If he is to return to work he could profit from support by DVR. . . (His) cognitive problems with learning and memory are not likely to improve. Therapy might help improve his motivation to work . . .

(Tr. 191).

### III.   Standards Applicable to Termination of Benefits.

The burden of proof in cases involving termination of benefits rests with the Commissioner. Hayden v. Barnhart, 374 F.3d 986, 991 (10th Cir. 2004); Glenn v. Shalala, 21 F.3d at 987; 20 C.F.R. §404.1594(a).

The criteria for evaluating whether benefits continue or end is set out in 20 C.F.R. §404.1594(f)(1) through (8):

> Step 1:   Is the claimant currently engaged in substantial gainful activity? If he is, the evaluation is ended, and benefits are terminated. 20 C.F.R. §§1594(f)(1).
>
> Step 2:   If the claimant is not currently engaged in substantial gainful activity, do his impairments meet or equal the severity of a listed impairment? *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1). If they do, the evaluation is ended and benefits are continued. If they do not, the evaluation continues. 20 C.F.R. 1594(f)(2).
>
> Step 3:   Has there been medical improvement, defined as any decrease in the severity of the claimant's impairments, since the most recent favorable decision? A finding of medical improvement is based on changes (improvement) in signs, symptoms and laboratory findings. 20 C.F.R. §§404.1594(f)(3), 404.1594(b)(1). If medical improvement has occurred the evaluation continues at step four. If there has been no medical improvement, the evaluation continues at step five.
>
> Step 4:   If there has been medical improvement, is that improvement related to the claimant's ability to work? This requires assessment of residual functional capacity

based on those impairments present at the time of the last favorable review. If medical improvement is not related to the ability to work, the evaluation continues at step 5. If medical improvement is related to the ability to work, the evaluation continues at step 6. 20 C.F.R. §404.1594(f)(4).

Step 5:   If there has been no medical improvement or if the medical improvement is not related to the claimant's ability to work, do any of nine specified exceptions to medical improvement apply. 20 C.F.R. §404.1594(f)(5). If an exception applies the evaluation continues at step 6. 20 C.F.R. §404.1594(f)(5).

Step 6:   If there has been medical improvement related to the claimant's ability to work, or if an exception to the medical improvement standard applies, are the combination of claimant's current impairments "severe." If the combination of impairments is severe, e.g., significantly limits the ability to perform basic work activities, the evaluation continues at step 7. If the combination of impairments is not severe, the evaluation is ended and benefits are terminated.   20 C.F.R. §404.1594(f)(6).

Step 7:   If the claimant's current impairments are severe, does he have the residual functional capacity to perform any of his past relevant work activity. If he does, the evaluation is ended and benefits are terminated.   If he does not the evaluation continues at step 8.   20 C.F.R. §404.1594(f)(7).

Step 8:   If the claimant is unable to do work performed in the past, the claimant can perform other work, considering his residual functional capacity, age, education and past work experience. If he can benefits are terminated. If he can not, benefits are continued. §20 C.F.R. §404.1594(f) (8).

## VI.   The ALJ's Decision.

At steps 1 and 2 the ALJ found that Plaintiff was not engaged in substantial gainful activity (Finding No. 1, p. 16), and that he did not meet the criteria for a listed impairment (Finding No. 2, Id.). The ALJ skipped step 3, making no finding as to medical improvement. At step 4, the ALJ made found that Plaintiff had a recent residual functional capacity assessment, but did not delineate the mental or physical capabilities that Plaintiff retained on a function by function basis.[5] (Finding No.

---

[5] "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule. . . (and) must first identify the individual's

8

4, p. 16). At step five, the ALJ found that an exception to the medical improvement standard applied, citing to Plaintiff's completion of vocational therapy.[6] (Tr. 15). The ALJ concluded his evaluation at step six, finding that Plaintiff's current impairments were not severe. The ALJ relied upon Plaintiff's ability to complete a community college course of study in a skilled field (gunsmithing) to support his finding that his mental impairment was not severe, and his daily activities[7], and "creditable medical opinions of record" to find that his physical impairments were not severe. (Tr. 15).

## VI. Issue Raised

The issue before the court is whether substantial evidence and the application of correct legal principles support the ALJ's determination that Plaintiff's impairments are not severe.

## VII. Discussion

Severity standards applicable to initial disability claims are also applicable to cases involving entitlement to continued disability benefits. SSR 85-28, West's Social Security Reporting Service at 392. The Supreme Court has adopted a "de minimus" standard with regard to determinations of severity: "[o]nly those claimants with slight abnormalities that do not significantly limit any 'basic work activity' can be denied benefits without undertaking" the subsequent steps of the sequential evaluation process. Bowen vs. Yuckert, 482 U.S. 137, 158, 107 S.Ct. 2287 (O'Connor, J.,

---

functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, Social Security Ruling 96-8p, 1996 WL 374184, *1.

[6] 20 C.F.R. §1594(d)(2) provides that a finding of medical improvement is not necessary if substantial evidence shows that the claimant has received vocational therapy related to the ability to work.

[7] Earlier in the opinion, the ALJ cited to Plaintiff's testimony that he watched TV, could sit at his computer for up to an hour downloading music, that he had reinjured his shoulder lifting weights, that he did some gunsmithing "under the table," from 1995-1999, that he can operate a vehicle with a standard transmission, can push a vacuum or shopping cart, can hunt on ground level and plays pool. (Tr. 14).

concurring); see also §§20 C.F.R. 404.1520(c), 404.1521(a). Basic work activities are "abilities and aptitudes necessary to do most jobs," §20 C.F.R. 404.1521(b), including "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling; seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgement, responding appropriately to supervision, coworkers, and usual work situations; and dealing with changes in a routine work setting." SSR 85-28, at 393. In order to be deemed nonsevere, the medical evidence must establish that there is "only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered"). Id. If a finding regarding medical severity is not clearly established by medical evidence, the evaluation must continue through the sequential evaluation process. Id.

The medical record overwhelmingly indicates that Plaintiff's continued impairments meet the applicable de minimus standard. Undisputed evidence from Dr. Fink establishes that Plaintiff has cognitive impairments and personality changes which adversely affect his ability to take orders and direction, or to do any highly technical tasks in the gunsmithing field.

With regard to evaluation of Plaintiff's physical impairments, the ALJ reached his opinion that Plaintiff's physical impairments were not severe by rejecting the opinions and findings of Dr. Schwartz, describing them as "vague, ambiguous and conclusory; . . . not well supported by clinical signs and laboratory findings; and . . . not consistent with the record as a whole." (Tr. 15). Three medical doctors examined Plaintiff. Dr. Reeve found virtually no physical abnormalities. Dr. Baten found inconsistencies in Plaintiff's presentation, but nonetheless determined that Plaintiff's impairments would prevent him work working a full day. Dr. Schwartz recorded significant

impairments. Of the three evaluations, that of Dr. Schwartz is most complete. As indicated above, it includes detailed history and physical examination, as well as uncontroverted and abnormal x-ray findings which support and explain many of Plaintiff's physical complaints. In addition, her finding of manipulative impairment is consistent with findings by Drs. Styskel and Baten. The medical opinion which is not consistent with the record as a whole is that of Dr. Reeve.[8] I find that the ALJ failed to apply correct legal principles in rejecting the opinion of Dr. Schwartz.

**VIII. Conclusion**

The Commissioner's determination that Plaintiff's impairments are not severe is not supported by substantial evidence or by the application of correct legal principles.

Plaintiff's Motion to Reverse or Remand Administrative Agency Decision is Granted. The Decision of the Commissioner terminating disability benefits is **REVERSED** and this matter is **REMANDED** to the Commissioner for reinstatement[9] and payment of continuing benefits pursuant to 20 C.F.R. §404.1597a(i)(6).

_____
Richard L. Puglisi
United States Magistrate Judge
(sitting by designation)

---

[8]A medical opinion that is more consistent with the record as a whole is accorded more weight. 20 C.F.R. §404.1527(d)(4). In at least two areas, the opinion of Dr. Reeve stands out as an anomaly. He alone found that Plaintiff had no problems with gait, while all other examiners and the Commissioner's DDS liaison noted ambulation difficulties. (Tr. 158-160, 163-165, 189, 192-193, 198, 238-240, 246-248, 114). Dr. Reeve stated that Plaintiff had only mild focal weakness of the right hand, while other examiners described clumsiness, increased tone and limited fine manipulation (Dr. Baten, Tr. 193, 195, 198): increased tone and decreased ability to perform rapid alternating movements affecting the ability to use the right hand (Dr. Schwartz, Tr. 239-240); noticeable problems with right hand (Dr. Fink, Tr. 189); and problems writing and using his hands/arms (DDS Liaison, Tr. 114).

[9]Plaintiff requests that benefits be reinstated as of June 2000. (Docket No.15, p. 5). It appears that Plaintiff has elected to receive benefits during the pendency of this appeal. (Tr. 104-105, 50). To the extent any such benefits have been tendered to Plaintiff, reinstatement will not include double recovery of same.